Filed 10/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOSE LUIS LOPEZ, JR., | B288396 |
| Plaintiff, | (Los Angeles County Super. Ct. No. BC562041) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant; | |
| WALLY'S WINE & SPIRITS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Hart Cole, Judge. Affirmed.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Scott Marcus, Chief, Civil Litigation Branch, Blithe S. Bock, Assistant City Attorney,

1

Michael M. Walsh, Deputy City Attorney, for Defendant and Appellant.

Thompson Coe & O'Meara; Freeman Mathis & Gary and Stephen M. Caine; Law Offices of John A. Hauser, and Stephen Enerle, for Defendants and Respondents.

\* \* \* \* \* \*

The owner or occupier of private property has a "duty" to exercise reasonable care "to maintain [its property] . . . in a reasonably safe condition" (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 (*Ann M.*), overruled on other grounds as stated in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527), but that duty does not generally extend to the publicly owned sidewalks and streets abutting the property unless the owner or occupier has "exercise[d] control over [that publicly owned] property" (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1157-1158 (*Alcaraz*); *Martinovich v. Wooley* (1900) 128 Cal. 141, 143 (*Martinovich*)). In this case, a pedestrian tripped and fell in a pothole located on city-owned property where the lip of a driveway and the gutter meet. This appeal therefore presents the question: Has the commercial business leasing the property that the driveway services exercised control over the location of the pothole (so as to create a duty of care to passersby) when the business has done no more than put the driveway and gutter to their "ordinary and accustomed" uses? We hold that the answer is no. The trial court was therefore correct in granting judgment notwithstanding the verdict to overturn a jury verdict that found the business partially liable for the pedestrian's injury.

2

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

On a rainy day in late February 2014, Jose Luis Lopez, Jr. (plaintiff) stepped on what looked like a puddle but which ended up being a four-inch-deep pothole. As a result, he dislocated his ankle, tore three ligaments, and fractured two bones; repairing the damage necessitated two rounds of surgery.

The pothole was located where the street gutter meets the lip of a driveway in front of 2136 Cotner Avenue in the City of Los Angeles (the City).

The property at 2136 Cotner Avenue (the Property) is owned by the Marvin A. Kahn Deceased Trust (the Trust), and Northern Trust Bank of California (Northern Trust) is one of the Trust's three trustees.[1] Since 2010, the Trust has leased the Property to Wally's Wine & Spirits (Wally's). Wally's uses the building on the Property to store wine for a restaurant it owns in Beverly Hills, for a liquor store it owns in Westwood, and to private individuals who pay a monthly fee to store wine in temperature controlled "wine lockers." Because Wally's uses vans to transport wine, the vehicles that access the Property are limited to those vans and other passenger vehicles. Wally's lease with the Trust obligates Wally's, as the lessee, to "keep the premises . . . in good order, condition and repair . . . including, but not limited to, all equipment or facilities, such as . . .

---

[1]      Plaintiff initially named the Trust and its co-trustees, including Northern Trust as additional defendants. After the close of evidence at trial, the trial court granted the Trust's, co-trustees', and Northern Trust's unopposed nonsuit. Neither the Trust nor Northern Trust is a party to this appeal.

landscaping, driveways, parking lots, fences, signs, sidewalks and parkways located in, on, or, adjacent to the Premises."

Wally's building is set back far enough from Cotner Avenue to provide for three marked, head-in parking spaces between the building and the sidewalk. Along the side of the building is an alleyway that, because it is wide enough for a vehicle, doubles as a driveway that leads to the rear of the Property, where there is an additional parking space as well as the building's entrance. To allow vehicles access to the parking spaces and alleyway, the driveway access to the Property runs the width of all three parking spaces and the alleyway. As the driveway slopes gently from the Property to a lip that is flush with the gutter, it is made up of two rows of large concrete squares. The upper row of square doubles as the sidewalk that runs parallel to Cotner Avenue, and one of those squares has a utility vault for a water meter mounted flush into it. One of the squares in the lower row has more utility vaults (likely, for power and gas) mounted flush into it. It is unknown when or by whom the utility vaults were installed, or whether the vaults provided utility service to the Property.

The pothole is located where the gutter and driveway lip come together, and is parallel to the head-in parking space closest to the alleyway. In between that space and the pothole is the upper-row concrete square with the water meter vault and a lower-row square that was patched over with asphalt five to ten years before the incident. The lower-row square with the additional utility vaults is right next to the patched-over square, is parallel to the alleyway, and is also patched with asphalt of the same vintage. The gutter also has some asphalt patching. It is

4

unknown who did the patching, although the patching was "consistent with, and more probably," done by the City.

It is undisputed that the Property extends to the edge of the sidewalk closest to Wally's building. Thus, the City owns the gutter, the sloping portion of the driveway and the sidewalk.

The pothole was caused by deterioration of the asphalt due to regular use of the driveway by vehicles and due to water flowing in the gutter.

On the day of the incident, plaintiff was on his lunch break from the car repair shop around the corner. He left the sidewalk on Cotner to cut diagonally across the driveway to get to his car, which he had parked on Cotner Avenue. That is when he stepped into the rainwater-filled pothole.

## II.    Procedural Background

### A.    *Complaint*

In October 2014, plaintiff sued the City and Wally's for negligence and premises liability.[2]

### B.    *Trial and verdict*

The matter proceeded to a week-long jury trial, and the jury returned a verdict awarding plaintiff $3,094,972.42. In its special verdict form, the jury found that the City owned or controlled "the property where [plaintiff] fell," that the property was in a dangerous condition, and that the City had "notice of the dangerous condition for a long enough time to have protected against it." The jury also found that Wally's "control[led] the area where [plaintiff] fell," and that it was "negligent in the use or maintenance of th[at] area." The jury found the City to be 75

_____

[2]     Plaintiff also sued the County of Los Angeles, but the County was dismissed after the trial court granted summary judgment in its favor. The County is not a party to this appeal.

5

percent responsible and Wally's, 25 percent. This meant the City owed $2,321,229.32 and Wally's owed $773,743.10.

### C. *Post-trial motions*

Both the City and Wally's moved for a new trial and for judgment notwithstanding the verdict (JNOV). In its JNOV motion, Wally's argued that substantial evidence did not support the jury's findings (1) that Wally's had exerted control over the pothole's location or (2) that Wally's negligence caused plaintiff's injury because the City had notice of the pothole in time to fix it. Following a full round of briefing and a hearing, the trial court issued a written order denying the City's motions for a new trial and for JNOV, denying Wally's motion for a new trial, and granting Wally's motion for JNOV.

In its order, the trial court provided two reasons for granting Wally's JNOV motion. First, the court found "no legal basis on which to find Wally's liable" due to the lack of any evidence that Wally's "control[led] the area where the pothole was located." In support of this finding, the court noted that (1) the City had admitted during discovery that it had "exclusive control" over the area where the pothole was located, (2) Wally's "did not control the area where the pothole was located" and "did not create the dangerous condition" given that all it did was "use[] the driveway [and the gutter] for the purpose and in the manner for which [driveways and gutters] [were] intended," and (3) Wally's lease with the Trust "did not" and could not "impose a duty on" Wally's "to protect the public from dangerous conditions on public property which [Wally's] did not create or control," and (4) Wally's "had no power to 'prevent, fix, or guard against the dangerous condition'" given that it needed a permit from the City to repair the driveway. "If every property owner were deemed to

6

have control over the gutter in front of their property" based solely on their ordinary use of that gutter, the court reasoned, "the scope of liability would expand dramatically." Second, and alternatively, the court found that any negligence by Wally's "could not have been the proximate cause of the accident because the jury found that the City actually had sufficient notice" of the pothole in time to repair it.

### D. *Appeal*

The City and Wally's filed timely appeals.[3] The City subsequently entered into a settlement agreement with plaintiff, who as part of that agreement assigned to the City his right to enforce the judgment against Wally's.

## DISCUSSION

The City argues that the trial court erred in granting Wally's JNOV motion absolving Wally's of all liability for plaintiff's injury. As with a directed verdict, a trial court may grant a motion for JNOV "only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict." (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110; see also, *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) We independently review the substantiality of the evidence. (*Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.* (2014) 231 Cal.App.4th 1131, 1143.) Of course, the substantiality of the evidence is measured against the elements the plaintiff must prove; what those elements are, and what they mean, are questions of law that we also independently review. (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 890; see also, *Vasilenko v. Grace Family Church* (2017) 3

---

3       Wally's subsequently dismissed its appeal.

Cal.5th 1077, 1083 (*Vasilenko*) [whether an entity owes a duty of care sufficient to give rise to liability for negligence "is a question of law" "review[ed] de novo"].)

The City attacks both of the trial court's main rationales for granting Wally's JNOV motion—that is, that Wally's did not control the location where the pothole was located and that, even if it did, there was no causal link between Wally's negligence and plaintiff's injury. We address the issue of control first and, because it is sufficient on its own to support the JNOV, there is no need to address the issue of causation. (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513 ["one good reason is sufficient to sustain the order from which the appeal was taken"].)

Because the jury's verdict against Wally's rests on its finding that Wally's was negligent, because a claim of negligence rests upon the breach of a duty of care owed to the plaintiff (e.g., *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1159; *Paz v. State of California* (2000) 22 Cal.4th 550, 559), and because it is undisputed that the City owned the location where the pothole was located, we must answer the following questions in evaluating the propriety of the trial court's grant of Wally's JNOV motion: (1) Under what circumstances does a person in possession of private property owe a duty of care to members of the public to protect or warn against a hazard located on abutting property that is publicly owned?,[4] and (2) Did substantial

_____

4      This question is distinct from the question of whether a person owes a duty of care as to hazards located on *its own property*, but where the plaintiff's resulting injury occurs on the abutting, publicly owned land. (See, e.g., *Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1479-1480 [plaintiff's child was hit by a car

8

evidence support the jury's verdict that this standard was met in this case?

## I.     When Does a Person Who Owns or Occupies Private Property Owe a Duty of Care As To Hazards on Abutting, Publicly Owned Property?

### A.     *The duty of care as to the property one owns or occupies*

The foundational principle of California tort law is that every person has a "duty . . . to exercise, in his or her activities, reasonable care for the safety of others." (*Vasilenko*, *supra*, 3 Cal.5th at p. 1083; *Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 366 ["the basic tenet of California law [is] that 'everyone is required to use ordinary care to prevent causing injury to others. [Citations.]'"]; see Civ. Code, § 1714, subd. (a) ["Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . ."].) As applied to persons who own or occupy land, California tort law imposes a duty "to maintain land in their possession and control in a reasonably safe condition." (*Ann M.*, *supra*, 6 Cal.4th at p. 674; *Alcaraz*, *supra*, 14 Cal.4th at p. 1156; CACI No. 1001.) A person maintains land in a "reasonably safe condition" if "'he [or she] has acted as a reasonable [person] in view of the probability of injury to others

---

in a public street after riding down steep driveway on landowner's property that intersected the street]; *Annocki v. Peterson Enterprises, LLC* (2014) 232 Cal.App.4th 32, 38 [plaintiff's son was hit by a car in a public street after driver of the car made left-turn from landowner's property where configuration of property failed to direct driver to safer way to exit property].)

. . . .'" (*Alcaraz*, at p. 1156, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 119.)

**B.** ***The duty of care as to abutting public property***

Does the general duty to maintain the property one owns or occupies extend to abutting property that is owned *by others*—and, in particular, to abutting property owned by public entities?

1. *The general rule*

The default answer is "no." That is because, for more than 150 years, the "general rule" has been that, "in the absence of a statute[,] a landowner is under no duty to maintain in a safe condition a public street" or "sidewalk" "abutting upon his property." (*Sexton v. Brooks* (1952) 39 Cal.2d 153, 157 (*Sexton*); *Martinovich, supra*, 128 Cal. at p. 143; *Eustace v. Jahns* (1869) 38 Cal. 3, 14-15; *Vasilenko, supra*, 3 Cal.5th at p. 1084; *Alcaraz, supra*, 14 Cal.4th at p. 1164; see generally, *Isaacs v. Huntington Mem'l Hosp.* (1985) 38 Cal.3d 112, 134 ["A defendant cannot be held liable for the defective or dangerous condition of property which it [does] not own, possess, or control."].)

2. *The "control" exception*

This general rule has one notable exception: A person who owns or occupies land will owe a duty to maintain abutting, publicly owned property in a reasonably safe condition if that person has "exercise[d] control over th[at] property." (*Alcaraz, supra*, 14 Cal.4th at p. 1158; CACI No. 1002; accord, *Johnston v. De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394, 399-400 (*Johnston*) [so holding, as to abutting privately owned property].) That is because a person who exercises "supervisory control" over property has the power to keep it in a reasonably safe condition, which makes it "just" to impose a "'duty to exercise due care in the management of th[at] property.'" (*Alcaraz*, at pp. 1157-1158,

10

1163, quoting *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 386 (*Owens*); *Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481, 489 (*Seaber*) ["the . . . right to manage and control" property "justif[ies] liability when one has failed to exercise due care in property management"].)  Thus, when it comes to imposing a duty upon an owner or occupier of land to maintain abutting, publicly owned property in a reasonably safe condition, "[t]he crucial element is control."  (*Schwartz v. Helms Bakery, Ltd.* (1967) 67 Cal.2d 232, 239 (*Schwartz*); *Alcaraz*, at p. 1161; *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 831 (*Low*).)

So when does the owner or occupier of private property exert control of abutting, publicly owned property?[5]

As a threshold matter, the owner or occupier must take some "affirmative" or "positive" action toward the abutting, publicly owned property.  (*Selger v. Steven Bros.* (1990) 222 Cal.App.3d 1585, 1590-1591 (*Selger*) ["affirmative" action required]; *Moeller v. Fleming* (1982) 136 Cal.App.3d 241, 244 (*Moeller*) [same]; *Winston v. Hansell* (1958) 160 Cal.App.2d 570 (*Winston*) [same]; *Barton v. Capitol Market* (1943) 57 Cal.App.2d 516, 518 (*Barton*) ["positive action" required].)  This threshold requirement flows inexorably from the general rule that a person's ownership or occupancy of property, without more, is insufficient to impose a duty to maintain abutting, publicly owned property.  (E.g., *Sexton*, *supra*, 39 Cal.2d at p. 157.)

---

**5** This analysis applies to private owners and occupiers of real property.  The duty of care owed by individuals with transient or mobile venues (such as street vendors) involves a different set of considerations.  (*Seaber*, *supra*, 1 Cal.App.4th at p. 489; see generally, *Schwartz*, *supra*, 67 Cal.2d 232.)

11

Thus far, courts have identified two situations in which an owner or occupier of private land has engaged in affirmative or positive action sufficient to hold them liable for a hazard located on abutting, publicly owned property: (1) when the owner or occupier has *created* that hazard (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 846 ["a person who creates a dangerous condition on a public roadway or walkway is liable for foreseeable injuries caused thereby"]; accord, *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, 368-369), or, (2) if the hazard was created by a third party, when the owner or occupier has "'dramatic[ally] assert[ed]'" dominion and control over the abutting, publicly owned property by effectively treating the property as its own (*Contreras v. Anderson* (1997) 59 Cal.App.4th 188, 200 (*Contreras*); CACI No. 1002).

a. Creating the hazard

The owner or occupier of private property can create an actionable hazard on abutting, publicly owned property in one of two ways.

First, an owner or occupier can create a more enduring hazard by "construc[ting]" or "alter[ing]" the configuration of the public property—whether by doing it itself or by urging the public entity to do so at its behest—and will be held liable for that hazard if the re-configuration is done (1) for the owner or occupier's own "special benefit" and (2) in a manner that causes the public property to "serve a use independent of and apart from the ordinary and accustomed use for which [that property (e.g., a sidewalk) was] designed." (*Sexton*, *supra*, 39 Cal.2d at pp. 157-158; *Kopfinger v. Grand Cent. Public Market* (1964) 60 Cal.2d 852, 858 (*Kopfinger*); *Peters v. San Francisco* (1953) 41 Cal.2d 419, 423 (*Peters*); *Seaber*, *supra*, 1 Cal.App.4th at pp. 488, 491;

12

*Winston, supra,* 160 Cal.App.2d at pp. 575-576; *Contreras, supra,* 59 Cal.App.4th at pp. 202-203.) Given these requirements, it is not enough that the owner or occupier "derives a benefit from the alteration." (*Contreras,* at p. 202.) Nor is the owner or occupier responsible if the public entity alters the public property "without regard to whether it benefits the adjoining property." (*Sexton,* at pp. 157-158.) But if the above stated requirements are satisfied, the duty to guard against the hazard lasts as long as the hazard itself; it is no defense that the alteration occurred when the private property was owned or occupied by a predecessor in interest. (*Sexton,* at p. 157; *Peters,* at p. 423.)

Applying this standard, courts have held owners and occupiers of private property liable when they (or the public entity, at the owner's or occupier's behest) have created a tripping hazard by placing a skylight (for a subterranean room) in the middle of the sidewalk (*San Francisco v. Ho Sing* (1958) 51 Cal.2d 127, 129-130, 138; *Monsch v. Pellissier* (1922) 187 Cal. 790, 790-792); by placing a wooden driveway across the sidewalk for use by heavy trucks (*Granucci v. Claasen* (1928) 204 Cal. 509, 511-512 (*Granucci*)); by cutting a driveway across the sidewalk at a depressed elevation (*Peters, supra,* 41 Cal.2d at pp. 422-423) or at a slope 16 times greater than the normal grade for sloping driveways (*Long v. John Breuner Co.* (1918) 36 Cal.App. 630, 631-632, 634-635 (*Long*)); or by placing the building (a restaurant) on the owner's property in a configuration that puts the restaurant's rear public entrance just feet from a berm located on the abutting public property, thereby creating a thoroughfare on the public property bisected by the berm (*Ross v. Kirby* (1967) 251 Cal.App.2d 267, 270-271 (*Ross*)).

13

Second, an owner or occupier can also be held liable for creating more temporary and fleeting hazards on abutting public property if it acts negligently in doing so. Applying this standard, courts have held owners and occupiers liable when they have created a slipping hazard on a sidewalk by dropping meat gristle on a sidewalk that a butcher shop uses for deliveries (*Kopfinger*, *supra*, 60 Cal.2d at p. 857); by allowing chemical run-off from the side of their building to drain across the sidewalk (*Barton*, *supra*, 57 Cal.App.2d at pp. 516-518, 520); and by allowing oil or grease from its own trucks to be dropped on the sidewalk (*Lee v. Ashizawa* (1964) 60 Cal.2d 862, 864-865 (*Lee*)). Indeed, this is why an owner or occupier is liable for tree roots that uplift a sidewalk (and thereby creating a tripping hazard) if the offending tree is located on *its own* side of the sidewalk (*Moeller*, *supra*, 136 Cal.App.3d at pp. 243-245), but is not liable if the tree is located on the other side owned by the public entity (*Jones v. Deeter* (1984) 152 Cal.App.3d 798, 801, 803-805 (*Jones*)) (unless, as discussed next, the owner or occupier has otherwise treated that other side as its own property (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1324-1325, 1335-1337 (*Alpert*))).

b.     Treating property as its own

Even if a hazard located on publicly owned property is created by a third party, an abutting owner or occupier of private property will be held liable for injuries caused by that hazard if the owner or occupier has "dramati[cally] assert[ed]" any of the "right[s] normally associated with ownership or . . . possession" by undertaking affirmative acts that are consistent with being the owner or occupier of the property and that go beyond the "minimal, neighborly maintenance of property owned by

14

another." (*Contreras*, *supra*, 59 Cal.App.4th at p. 200; *Alcaraz*, *supra*, 14 Cal.4th at p. 1167; *Contreras*, at p. 198 ["simple maintenance of an adjoining strip of land owned by another does not constitute an exercise of control over that property"].)

Applying this standard, courts have held owners and occupiers liable for a hazard created by a third party on abutting, publicly owned land when the owners or occupiers erected a fence around, as well as maintained, the property (*Alcaraz*, *supra*, 14 Cal.4th at pp. 1161-1162); put up a lighted sign to illuminate the property (*Johnston*, *supra*, 28 Cal.2d at p. 401); installed sprinklers, planted trees and maintained the property (*Alpert*, *supra*, 81 Cal.App.4th at p. 1135); or mowed and watered grass, removed debris and repaired damage to the property (*Low*, *supra*, 7 Cal.App.3d at pp. 830, 834). Conversely, courts have declined to hold a property owner or occupier liable for injuries sustained on a public sidewalk abutting the property just because a third party left doggy detritus on that sidewalk. (*Selger*, *supra*, 222 Cal.App.3d at pp. 1588, 1592-1593.)

## II. Did the Evidence Presented at Trial Constitute Substantial Evidence That Wally's Had a Duty to Maintain the Publicly Owned Driveway Lip and Gutter?

### A. *Analysis*

#### 1. *Application of precedent*

At the outset, we note that there is no statute requiring California property owners to maintain the sidewalks, driveways and gutters abutting their property. Accordingly, whether Wally's owed a duty—and can be held liable—depends on whether it exercised control over the area. Substantial evidence did not support the jury's implicit finding that Wally's "exercis[ed] control" over the driveway lip and gutter (*Alcaraz*,

15

*supra*, 14 Cal.4th at p. 1158), as the term "control" is defined by the above described precedent.

There is no substantial evidence to support a finding that Wally's *created* the pothole. Although the City implies to the contrary in its appellate briefs, there was no evidence presented at trial that the driveway apron or gutter were "constructed" or "altered" by Wally's, by any of its predecessors in interest, or by the City at its (or their) behest. (*Sexton*, *supra*, 39 Cal.2d at pp. 157-158.) Because plaintiff (in whose shoes the City is now standing) bore the burden of proof, this void in the evidence is fatal. (See *Contreras*, *supra*, 59 Cal.App.4th at pp. 201-202.) Even if we ignore this first evidentiary deficiency, there was also no evidence that the sloped driveway or the gutter "serve[d] a[ny] use independent of and apart from the ordinary and accustomed use for which [driveways and gutters] are designed." (*Sexton*, at pp. 157-158.) In California, "the use of a sidewalk as a driveway to the abutting property is . . . one of the ordinary and accustomed uses for which sidewalks are designed." (*Winston*, *supra*, 160 Cal.App.2d at p. 576-577.) Moreover, there was no evidence that the sloped driveway in this case deviated in any way from the standard construction of driveways (cf. *Long*, *supra*, 36 Cal.App. at pp. 631-632, 634-635) and no evidence that Wally's used the driveway for vehicles other than ordinary cars and vans (cf. *Granucci*, *supra*, 204 Cal. at pp. 511-512). There was also no evidence that the gutter running in front of Wally's did anything beyond its "ordinary and accustomed use" of carrying away water, for which gutters are designed, and no evidence that Wally's deposited more water into the gutters than any other property owner along Cotner Avenue. And although plaintiff adduced some testimony indicating that the utility vaults may

16

have contributed to the deterioration of the asphalt (and hence to the creation of the pothole), there was no evidence that those vaults were placed in the driveway at the behest of Wally's or its predecessors or that those vaults served any use beyond that for which they are ordinarily designed.  At most, the evidence established that Wally's benefitted from having a standard driveway providing access to the Property and a standard gutter that carried water away from it, but it is well settled that "liability . . . does not arise upon a mere finding that the abutting owner derives a benefit" from use of that public property. (*Contreras*, at p. 202; *Seaber*, *supra*, 1 Cal.App.4th at p. 492.)

There is no evidence to support a finding that Wally's "dramatic[cally] assert[ed]" any of the "right[s] normally associated with ownership or . . . possession" over the area where the pothole developed.  (*Contreras*, *supra*, 59 Cal.App.4th at p. 200.)  At most, Wally's kept the gutter free from debris.  But it is well settled that "'minimal, neighborly maintenance'" "does not constitute" a sufficient "exercise of control" to give rise to liability. (*Id.* at pp. 198, 200.)

### 2. *Policy considerations*

Aside from being inconsistent with precedent, imposing tort liability upon Wally's based upon the evidence adduced at trial is also at odds with the public policy underlying boundaries of tort law defined by that precedent.  The law generally declines to saddle those who own or occupy land with the duty to maintain abutting public property in a safe condition because those individuals "generally [have] no right to control" the streets, gutters, driveways and sidewalks "owned and maintained by the government."  (*Vasilenko*, *supra*, 3 Cal.5th at p. 1084.)  In this run-of-the-mill situation, the government is in the best position to

17

monitor and maintain the property it owns, and thus is the logical party to hold accountable for lapses in the duty to maintain the property in a safe condition. (*Id.* at p. 1087 ["The policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and thus best suited to prevent it."].) To borrow a tagline, with the power of control comes the responsibility to protect. This is why the exception to this general rule imposes liability upon only those owners and occupiers of private land who affirmatively exert control over the abutting, publicly owned property.

Were we to hold Wally's liable in this case, we would be doing so when Wally's did no more than put a standard driveway and a standard gutter constructed by the City to their ordinary uses. If, as the City suggests, the fact that Wally's benefitted from its customers' ability to use the driveway and its own ability to use the gutter constitutes "control" sufficient to impose liability, then the same would seem to be true for *every* business owning or occupying property. Those businesses would, under this new definition of "control," be liable for injuries sustained by passersby on any abutting sidewalks, driveways and gutters owned by the local public entity. This new liability would ostensibly extend to injuries sustained on the publicly owned streets running in front of those businesses as well. Not only would this new definition of "control" cause the exception imposing liability to swallow the general rule of "no liability," it would also decouple the rule from its policy by imposing liability upon owners and occupiers who have in no meaningful way actually exercised control over the public property they are now charged with protecting and, unlike the public entities who own

that property, have no inherent authority or taxpayer funding to maintain those sidewalks, driveways, gutters and streets.[6]

We are mindful that plaintiff's expert offered testimony that Wally's had a legal duty to repair the pothole, but this testimony constitutes a legal conclusion that is both impermissible (*People v. Jones* (2013) 57 Cal.4th 899, 950) and, for the reasons we have explained above, wrong.

## B. *The City's further arguments*

The City offers a plethora of arguments attacking the trial court's grant of a JNOV. Some rely on the analytical framework set forth above; some do not.

### 1. *Arguments challenging the analysis set forth above*

The City attacks the analysis set forth above with three arguments.

First, the City contends that substantial evidence supports the jury's implicit finding that Wally's created and/or exacerbated the pothole by using the driveway, using the gutter, and using water, power and gas served by the meter vaults lodged in the driveway. This contention lacks merit. As explained above, there was no evidence that Wally's or its predecessors in interest—or, on behalf of either, the City—configured the driveway, gutter or meter vaults specially for Wally's or its predecessors or subsequently put the driveway, gutter or meter vaults to anything but their "ordinary and accustomed use[s]."

---

[6] And to the extent "control" is defined as *any* benefit (rather than a *commercial* benefit to a business), the City's argument risks imposing this duty on residential property owners as well (who benefit from having curbs and gutters in front of their residences).

Second, the City asserts that substantial evidence supports the jury's implicit finding that Wally's exerted control over the area where the pothole was located. The City starts by arguing that there was evidence that Wally's kept the gutter free of debris. As noted above, however, such "simple maintenance" is insufficient to constitute the level of "control" needed to impose tort liability. (*Contreras*, *supra*, 59 Cal.App.4th at pp. 198, 200.) The City next points to the provision in Wally's lease with the Trust, in which Wally's promised to "keep the premises . . . in good order, condition and repair . . . including, but not limited to," the "driveways, parking lots, . . . sidewalks and parkways located in, on, or, adjacent to the Premises." But just as state and local statutes requiring owners and occupiers to reimburse public entities for repairs to publicly owned sidewalks does not create a duty to protect third parties using those sidewalks (e.g., *Schaefer v. Lenahan* (1944) 63 Cal.App.2d 324, 327; *Selger*, *supra*, 222 Cal.App.3d at pp. 1589-1590; *Jordan v. City of Sacramento* (2007) 148 Cal.App.4th 1487, 1490), Wally's contractual promise to its landlord to keep the driveways, sidewalks, and parkways in "good" "condition" does not create a duty to protect third parties using those driveways, sidewalks and parkways in the absence of any evidence that the "motivating purpose" of that clause was to benefit passersby (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 821, 830), and no such evidence was admitted at trial. The City lastly points to evidence that it would have granted Wally's a permit to repair the pothole had it asked, and appears to reason that Wally's ability to get a permit constitutes substantial evidence that Wally's had some control over the driveway lip and gutter. Of course, the pertinent test for "control" is whether the owner or occupier has dramatically asserted ownership rights

20

over abutting, publicly held property, and not whether the public entity will grant that owner or occupier permission to fix a hazard on that abutting, publicly owned land.  If anything, the fact that Wally's needs *permission* from the City connotes that *the City* is the party with exclusive control over that area. (*General Ins. Co. of Am. v. St. Paul Fire & Marine Ins. Co.* (1974) 38 Cal.App.3d 760, 765-766 [need for permission implies "exclusive control" of permission giver]; *Olmstead v. San Diego* (1932) 124 Cal.App. 14, 21-22 [same]; cf. *Juchert v. California Water Service Co.* (1940) 16 Cal.2d 500, 514 [need for government permit to install privately owned pipeline does not imply *government*'s exclusive control of pipeline]; *Patterson v. Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 844-845 [need for government permit for construction *on property owner's own land* is a ministerial act]; *Chatman v. Alameda County Flood Control Etc. Dist.* (1986) 183 Cal.App.3d 424, 431 [same].)

Third, the City implies that we must infer sufficient evidence to support the jury's special verdict from the fact that the jury came to its verdict.  We reject this implication as utterly circular.  Like the trial court, our task is to evaluate *the evidence presented at trial*.  If, as the City suggests, we can use the jury's verdict to fill in any gaps in that evidence, there would always be substantial evidence to support that verdict and judgment notwithstanding the verdict would never be appropriate.  That is obviously not the law.

2. *Arguments based on an alternative legal analysis*

The City offers three further arguments for reversal that do not rely on the analytical framework set forth above.

First, the City urges that the jury's verdict must be affirmed under *Sears, Roebuck & Co. v. Meyer* (9th Cir. 1953) 205

21

F.2d 321 (*Sears*) and several other out-of-state cases.  To be sure, *Sears* and the out-of-state cases all hold that the owner or occupier of private property that "maintain[s] and knowingly permit[s] its customers to use a driveway" that crosses a sidewalk has a duty to protect third parties against hazards left on that driveway by customers.  (*Sears*, at p. 322; see also *Davis v. Pecorino* (N.J. 1975) 350 A.2d 51, 55 [same]; *Joel v. Electrical Research Products Inc.* (2d Cir. 1938) 94 F.2d 588, 590 [same, applying New York law]; *Texas Co. v. Williams* (Ala. 1934) 228 Ala. 30, 31; *Groves v. Tacoma* (Wash. Ct. App. 1989) 777 P.2d 566, 567-568; *District of Columbia v. Texaco, Inc.* (D.C. Ct. App. 1974) 324 A.2d 690, 691.)  But the rule followed by *Sears* and the other cases is different from the law of California (and, for that matter, the law in several other states).  In California, an owner or occupier has a duty to guard against hazards created by third parties on abutting, publicly owned property only if the owner or occupier has "dramatic[ally] assert[ed]" rights akin to ownership rights over that abutting property, "simple maintenance" is not such a dramatic assertion, and the failure to maintain by itself is thus not actionable.  (*Contreras*, *supra*, 59 Cal.App.4th at p. 200; *Alcaraz*, *supra*, 14 Cal.4th at p. 1167; accord, *Vasquez v. Legend Natural Gas III, L.P.* (Tex. Ct. App. 2016) 492 S.W.3d 448, 453-454; *Chambers v. Honolulu* (Haw. 1965) 48 Haw. 539, 544-545.)  Under California's rule, allowing one's customers to use the publicly owned property to access one's business is not enough to constitute an assertion of "control."  We are mindful that *Lee*, *supra*, 60 Cal.2d at p. 867 distinguished *Sears* (and, on that basis, ostensibly upheld it), but *Alcaraz*'s subsequent holding that liability must rest on more than simple maintenance overruled *Lee*'s 60-year-old dicta on this point.

22

Second, the City contends that Wally's had "de facto" control over the area where the pothole formed because Wally's, as a business, derived a commercial benefit from the driveway and gutter where the pothole formed. We reject this contention for two reasons. To begin, the pertinent law defines "control" as a "'dramatic assertion'" of any of the "'right[s] normally associated with ownership or . . . possession'" (*Contreras*, *supra*, 59 Cal.App.4th at p. 200); under this law, "de facto" control does not exist. Further, the City's contention effectively makes commercial benefit the sole predicate for the imposition of a duty of care over abutting, publicly owned property. But our Supreme Court has made clear that "commercial benefit [is] to be but *one factor*" relating to control, not—as the City urges—*the dispositive factor*. (*Alcaraz*, *supra*, 14 Cal.4th at p. 1163, italics added; *Owens*, *supra*, 198 Cal.App.3d at p. 387 [declining to impose a duty merely because property owner derives a "commercial benefit" from its customers' use of abutting, publicly owned streets and sidewalks]; accord, *Ross*, *supra*, 251 Cal.App.2d at pp. 270-271 [imposing duty because business created hazard by placement of its rear public entrance, coupled with commercial benefit]; *Kopfinger*, *supra*, 60 Cal.2d at p. 857 [imposing duty because business created hazard by dropping gristle on sidewalk, coupled with commercial benefit]; cf. *Nevarez v. Thriftimart, Inc.* (1970) 7 Cal.App.3d 799, 805 [mobile vendors present different issues than property owners].)

Third, the City urges us to divide the universe of cases regarding the duties of owners and occupiers to maintain abutting, publicly owned property into sub-universes depending upon the nature of the publicly owned property at issue—that is, "sidewalk cases," "driveway cases," "gutter cases," and "street

cases." On this basis, the City encourages us to disregard all the "sidewalk cases" and to focus on the "driveway cases" (namely, *Sears* and the other out-of-jurisdiction cases it cites). Although the cases sometimes refer to certain groups of cases as "sidewalk accident decisions" and the like (e.g., *Low*, *supra*, 7 Cal.App.3d at p. 832; *Jones*, *supra*, 152 Cal.App.3d at p. 803), the rule imposing a duty to maintain abutting, publicly owned property upon owners and occupiers is the same rule regardless of the nature of that publicly owned property and turns on the same consideration: Did the owner or occupier exert control over that publicly owned property? We decline the invitation to create a myriad of sub-universes, each with its own rule, when a unitary rule—supported by a unitary public policy—applies viably across this proffered multiverse.

\* \* \*

In light of our analysis, we have no occasion to reach the City's attacks on the trial court's alternative grounds for granting JNOV.

## DISPOSITION

The judgment is affirmed. Wally's is entitled to its costs on appeal.

<u>CERTIFIED FOR PUBLICATION</u>.

_____, J.
HOFFSTADT

We concur:

_____, P. J.
LUI

24

_____, J.
CHAVEZ